**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ASHLEY BROOKE NEESE,

   *Plaintiff*,

 v.

UNITED STATES DEPARTMENT OF
JUSTICE,

   *Defendant*.

Civil Action No. 1:19-cv-01098 (CJN)

## MEMORANDUM OPINION

Ashley Neese is a former Assistant U.S. Attorney who submitted a Privacy Act and Freedom of Information Act request to the Department of Justice's Office of Professional Responsibility, seeking records relating to OPR's investigation of her. OPR has produced thousands of pages of records, but has redacted many and has withheld others entirely.

The government has moved for partial summary judgment. *See generally* Mem. in Supp. of Def.'s Mot. for Part. Sum. Judg. ("Mot."), ECF No. 32-1. It argues that OPR's database is exempt from the Privacy Act, and that it properly withheld and redacted documents under several FOIA exemptions. *See generally id.* It also argues that it conducted an adequate search. *See generally id.* The Court agrees on most counts, and thus grants Defendant's Motion in substantial part.

### BACKGROUND

As an Assistant U.S. Attorney, Neese was involved in a criminal narcotics investigation called "Operation Pain Train." Declaration of Margaret S. McCarty ("McCarty Decl."), ECF No. 32-3, at ¶ 9. A witness involved in that investigation alleged that Neese may have engaged in

professional misconduct.  *Id.*  On May 3, 2018, the Executive Office of U.S. Attorneys referred these allegations to OPR, *id.*, which is the DOJ section charged with conducting internal investigations of DOJ employees, *id.* ¶ 4.  OPR initiated an inquiry into the matter, which it later converted it into a full investigation.  *Id.* ¶ 9.

While OPR's investigation was ongoing, Neese requested access to the evidence against her, along with the other information OPR had compiled.  *Id.* ¶ 10.  She wanted it to help assist in responding to the allegations.  *Id.*  But while OPR allows investigated attorneys to respond to allegations in various ways, it treats its investigations as confidential.  *Id.*  Thus, while OPR did provide Neese with copies of her own emails and text messages that it had obtained, it declined to give her all the information she sought.  *Id.*

Stymied on that front, in July 2018 Neese submitted to DOJ a FOIA and Privacy Act request seeking six categories of documents relating to the investigation.  *See* Pl.'s Resp. and Opp. to Def.'s Statement of Material Facts ("Pl.'s Facts"), ECF No. 38, at ¶ 1.  OPR acknowledged receipt of Neese's request about a month and a half later.  *Id.* ¶ 2.  But by December, it had still failed to act.  *See id.* ¶ 3.  Neese thus filed an administrative appeal with the Office of Information Policy.  *Id.*  This lawsuit followed.  *Id.* ¶ 4.

In July 2019, a month after Neese filed suit, OPR finally conducted a search for responsive documents.  *See id.* ¶ 5.  (Neese argues that OPR did some searches before this, but she does not contest that OPR searched on this day as well.  *See id.*)  OPR's staff obtained all physical records related to the investigation from Suzanne Drouet, the OPR attorney handling the investigation. McCarty Decl. at ¶ 16.  Drouet also provided all emails she had sent and received regarding the investigation, and she provided the OPR case number associated with investigation:  201800523. *Id.* ¶ 18.

OPR maintains an electronic document management system, called Hummingbird.  Pl.'s Facts at ¶ 6.  Hummingbird maintains copies of all complaints received by OPR and all documents associated with those complaints.  McCarty Decl. at ¶ 17.  It organizes that information by case number; nothing can be included in Hummingbird without being associated with a given "Case/Subject" number.  *Id.* at ¶ 18; *see also* Pl.'s Facts at ¶ 6.  Accordingly, OPR searched Hummingbird for "201800523" to locate responsive records.  McCarty Decl. at ¶ 18; Pl.'s Facts at ¶ 6.

For its first search of Hummingbird, OPR searched for all documents filed before July 20, 2018—the date of Neese's request.  Pl.'s Facts at ¶ 7.  This search revealed 3,890 potentially responsive pages of information, as well as 28 discs.  *Id.*  Some of these documents had originated with the Executive Office of U.S. Attorneys, and some had originated with the FBI.  *Id.* ¶ 8 (not disputing the origination of the documents).  OPR thus referred those documents to each respective department for processing.  *Id.* (not disputing that the referral was made).  In particular, on August 13, 2019, OPR referred 2,704 pages and 22 discs of responsive records to EOUSA, *id.* ¶ 9; sent another disk that month, *id.* at ¶ 11; forwarded 107 more pages the next month, *id.* at ¶ 10; and sent a single page on November 18, 2019.  *Id.* at ¶ 12.  As for the FBI, OPR referred to it seven pages and one disc for processing.  *Id.* ¶ 13.  It followed up with a few more documents later.  *Id.* ¶ 14.  During this period, OPR continued making productions of processed documents, many of which had redactions under FOIA Exemptions 3, 5, 6, 7(C), and 7(E).  *See id.* at ¶¶ 15–19.

By the spring of 2020, Neese had developed some objections to the adequacy of OPR's search; she sent it two letters to this effect.  *Id.* ¶ 21.  OPR thus conducted another search of Hummingbird, this time using a cutoff date of July 25, 2019—the date of OPR's first search.  *See id.* (not disputing that the search was done).  This supplemental search revealed eighty-nine more

documents.  *See id.* ¶ 22 (not disputing the amount of documents found).  All the while, document production continued.  *See id.* at ¶ 23.

This Motion for Partial Summary Judgment followed.  *See generally* Mot.

## LEGAL BACKGROUND

Under Rule 56 of the Federal Rules of Civil Procedure, a court may grant summary judgment when the pleadings, discovery, affidavits, and other material on file show no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

"FOIA mandates a 'strong presumption in favor of disclosure.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).  This means that an agency must disclose records on request unless they fall within one of nine statutory exemptions. *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). After reviewing the agency's representations on why it made such redactions, the Court must then decide "whether [the agency's] non-disclosure was permissible." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015).  In doing so, it can rely on the information provided by the agency—like declarations and affidavits—so long as "the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Responsibility & Ethics in Wash. v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).

It is up to the defendant in a FOIA matter to show that its search for responsive records was adequate. *Light v. DOJ*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013). Whether a given search was adequate necessarily turns on the individual circumstances of each case. *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). But in all events the "agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). This can be met by providing a "reasonably detailed affidavit, setting for the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.*

Throughout all of this analysis, the Court must keep in mind that "FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage [sic] the executive branch." *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 662 (D.C Cir. 2003) (quoting *Johnson v. Exec. Off. for U.S. Att'ys.*, 310 F.3d 771, 776 (D.C. Cir. 2002)).

The Privacy Act provides a separate path to receive certain documents. Under its terms, an "agency that maintains a system of records" must let an individual get access to "any information pertaining to [her] which is contained in the system," 5 U.S.C. § 552a(d)(1), so long as no exception applies, *id.* § 552a(k). "If a FOIA exemption covers the documents, but a Privacy Act exemption does not, the document must be released under the Privacy Act; if a Privacy Act exemption but not a FOIA exemption applies, the documents must be released under FOIA." *Martin v. Office of Special Counsel*, 819 F.2d 1181, 1184 (D.C. Cir. 1987).

### I. OPR Conducted an Adequate Search

Neese first avers that OPR conducted an inadequate search. The Court disagrees.

As discussed above, OPR began its search in July 2019.  McCarty Decl. at ¶ 16.  OPR gathered all physical records related to the Neese investigation from Suzanne Drouet, the OPR attorney assigned to the investigation, along with all emails she had sent or received related to the investigation.  *Id.*  And she gave OPR the Neese investigation case number, 201800523.  *Id.*

OPR then searched that case number in Hummingbird, its document-management system.  *Id.* at ¶¶ 17–18.  All information submitted into Hummingbird is associated with a case number, so by searching "201800523" in the system, OPR would necessarily identify all records associated with the Neese investigation in that system.  *Id.* ¶ 18.  But OPR also requested that Jeffrey Ragsdale and William Birney, who had supervised and worked with Drouet on the Neese investigation, search for and provide any additional emails or documents in their possession that were responsive to Neese's request but not stored in Hummingbird.  *Id.* ¶ 19.  OPR also independently searched the electronic files of two former OPR lawyers.  *Id.*

Using the cutoff date of July 20, 2018, OPR identified nearly 4000 pages of responsive documents, in addition to 28 discs, from these searches.  *Id.* at ¶ 20.  OPR later ran a supplemental search in Hummingbird for the period between July 20, 2018, and July 25, 2019.  *Id.* ¶ 34.  It identified another 89 pages of responsive documents.  *Id.*

OPR conducted a reasonable search.  Its declarations show that "it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby*, 920 F.2d at 68.  Since Neese never identified particular locations that the agency should look, OPR acted reasonably in deciding "to confine its inquiry to [its] central filing system."  *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998).  And by acquiring the records of those in charge of and supervising the Neese

investigation, OPR has shown that it followed all leads that were both "clear and certain." *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996).

Neese's arguments to the contrary miss the mark.  First, she notes that it took more than a year following her submission for OPR to conduct its initial search.  *See* Pl.'s Reply and Opp. to Def.'s Mot. for Par. Sum. Judg. ("Pl's Resp."), ECF No. 37, at 12–13.  But while this delay is troubling, it does not go to the *adequacy* of the search that OPR did eventually conduct.

Second, Neese notes the "critical admission and concession that OPR has its own system of records and that all records about Ms. Neese were retained in that system," Hummingbird.  *Id.* at 13.  She then explains that she knows there is a transcript of an interview from May 3, 2018, that should be stored in that database, but has not yet been produced.  *Id.*  But Neese later acknowledges that OPR sent the transcript at issue to another agency for processing and production.  *Id.* at n.10.  While Neese has some objections about that referral, that does not go to the adequacy of the search conducted by OPR.  If anything, the fact that this document was located confirms the wisdom of OPR's decision to primarily focus its search efforts on the Hummingbird system.

Next, Neese notes that the initial search conducted by OPR was necessarily incomplete, as OPR has since supplemented its initial search with more recently discovered responsive records.  *Id.* at 13.  But "continuing discovery and release of documents does not provide that the original search was inadequate, but rather shows good faith on the part of the agency that it continues to search for good documents."  *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 63 (D.D.C. 2003).  Indeed, the Court of Appeals has explained that it "would be unreasonable to expect even the most exhaustive search to uncover *every* responsive file."  *Meeropol v. Meese*, 790 F.2d 942,

953 (D.C. Cir. 1986) (emphasis in original).  Supplemental searches and productions are not only proper, but often necessary.

Neese also objects to McCarty's declaration, noting that it does not state whether OPR conducted any "computer searches" to locate the requested records.  Pl.'s Resp. at 14.  She cites an unpublished case from 1994 for support.  *See id.* (citing *Thompson Publ'g Grp., Inc. v. Health Care Fin. Admin.*, No. 92-2431, 1994 WL 116141, at *1 (D.D.C. Mar. 15, 1994)).  But that is not a fair characterization of McCarty's declaration.   And in any event, McCarty has since supplemented her declaration, making clear that OPR *did* conduct a "computer search" of all relevant sources.  *See* Sec. Decl. of Margaret S. McCarty ("Sec. McCarty Decl."), ECF No. 44-1, at ¶ 10.

Neese also questions OPR's failure to search the records of two of its former employees. Pl.'s Resp. at 14.  But as OPR's declaration explains, those employees' "only involvement was in receiving and acknowledging Plaintiff's Privacy Act and FOIA requests; they were not involved in the underlying misconduct investigation that is the subject of Plaintiff's request for records. Accordingly, they would not possess records responsive to the requests, unless copies of those records were provided to them by Ms. Droute, Mr. Ragsdale, or Mr. Birney."  Sec. McCarty Decl. at ¶ 12.  OPR has thus submitted a "reasonably detailed affidavit . . . averring that all files likely to contain responsive records (if such records exist) were searched."  *Oglesby*, 920 F.2d at 68. That is enough.

Neese also questions what she sees as an internal inconsistency in some letters that OPR sent her.  On March 6, 2020, she notes, OPR sent her a letter saying that thirty-eight pages of internal emails were sent by OPR to EOUSA for consultation.  Pl.'s Resp. at 14.  A few months later, OPR told her that twenty-five pages of internal emails had been sent to EOUSA—not thirty-

eight. *Id.* at 15.  That leaves thirteen pages unaccounted for.  But as McCarty explains, the March 6 letter contained an error:  twenty-five pages had been sent to EOUSA, and thirteen pages to the FBI, for a total of thirty-eight pages.  Sec. McCarty Decl. at ¶ 13.  This quibble does not suggest that OPR's search was inadequate.

Finally, Neese argues that OPR conducted an inadequate search by using as a cutoff date the date of her request, and then supplementing it with another search a year later.  Pl.'s Resp. at 15.  She notes that she wants OPR to conduct more new searches to avoid future litigation.  As she puts it, "to avoid future litigation, Plaintiff Neese asked OPR to produce to her records and information pertaining to the Neese investigation that were created or obtained after July 25, 2019 within communications with DOJ employees as part of the present litigation." *Id.* at 16.  Yet it is not up to this Court to order supplemental searches after the initial search date; a responding agency is under no obligation to search for records created after the date of the FOIA request.  *See Am. Oversight v. U.S. Dep't of Justice*, 401 F. Supp. 3d 16, 36–37 (D.D.C. 2019).  This makes sense: a FOIA request seeks documents that exist at a specific moment in time.  It does create an unending obligation to collect and produce all documents created in the future.

Accordingly, the Court concludes that OPR conducted an adequate search.

## II. OPR REASONABLY REFERRED DOCUMENTS TO OTHER DOJ COMPONENTS

Neese next objects to OPR's having referred documents to other DOJ components for processing.  *See* Pl.'s Resp. at 16–19.  She notes that she is "unaware of any statutory authority, caselaw, or Department Regulations that <u>require</u> OPR to send records maintained in OPR's system of records pertaining to Plaintiff Neese to any other component for review and production." *Id.* at 16 (emphasis in original).  But even if these referrals were not *required*, that does not mean they were not *allowed*.  Neese submitted her FOIA and Privacy Act request to the Department of Justice.

OPR is, of course, part of the DOJ, as are the EOUSA and FBI—the two components to which OPR referred documents. This is not a case where referrals were made outside of an agency, let alone the Executive Branch. *Contra Maydak v. U.S. Dep't of Justice*, 254 F. Supp. 2d 23, 40 (D.D.C. 2003).

Neese's real objection seems to be the pace with which EOUSA and the FBI have processed those documents. But those documents are not before the Court on this Motion. Indeed, the Court asked the Parties if they thought it more appropriate to wait until all productions had been made before resolving this Motion. *See* Minute Order of Sept. 9, 2021. Both said no. *See generally* Joint Status Report of Oct. 15, 2021, ECF No. 54.

Thus, because OPR can refer documents to other DOJ components, whether required to or not, the Court sees no merit to Neese's objection that it did.

### III. OPR'S DATABASE IS EXEMPT FROM THE PRIVACY ACT

Turning to Neese's principal argument, she contends that the Privacy Act applies to her request, and thus FOIA exemptions are irrelevant. *See* Pl.'s Resp. at 19–32. OPR disagrees, arguing that it has properly invoked exemption (k)(2) to the Privacy Act. *See* Def.'s Reply in Supp. of Mot. for Par. Summ. Judg. ("Def.'s Reply"), ECF No. 44, at 8–11.[1] The Court agrees with OPR.

Exemption (k)(2) exempts from disclosure investigatory material compiled for law-enforcement purposes. 5 U.S.C. § 552a(k)(2). And as explained by OPR's declarant, pursuant to 28 C.F.R. § 0.39a, OPR has authority to investigate allegations of misconduct involving DOJ attorneys relating to the exercise of their authority to investigate, litigate, or provide legal advice.

---

[1] The government originally claimed that exemption (j)(2) applied, as well. *See* Mot. at 5–6. It did not defend this assertion in its Reply Brief. *See* Def.'s Reply at 8–11. The Court will thus only consider the exemption (k)(2) argument.

McCarty Decl. ¶ 37.  "Under this investigative authority, OPR's principal law enforcement duty is to review, investigate, and when warranted, refer findings of professional misconduct to the Professional Misconduct Review Unit for appropriate action." *Id.* (citing 28 C.F.R. § 0.39a(a)(1)).

In this case, "[u]pon a referral from the U.S. Attorney through EOUSA, based upon allegations from a witness in a criminal investigation, OPR compiled the records at issue in this case from a variety of sources to fully investigate allegations that Plaintiff may have violated applicable standards of ethical conduct in the criminal Operation Pain Train investigation and resulting prosecutions." *Id.*  As the declaration explains, "OPR's investigation focuses on these specific alleged illegal acts that, if proved, could result in civil sanctions, such as referral to state bar licensing authorities." *Id.*

Neese disagrees.  She argues that OPR's declaration cites no caselaw holding that OPR's entire system of records is exempted under exemption (k)(2).  Pl.'s Resp. at 30–31.  Rather, she contends, exemption (k)(2) covers only material compiled for *criminal* matters, as well as material compiled for other investigative law-enforcement purposes. *Id.* at 31.  OPR's database, she argues, does not fall under either prong. *See id.*

The arguments by both parties largely miss the relevant question.  Exemption (k)(2) does not apply at a court's discretion, or depending on whether the Court views the records contained in the system to be of the kind that should be exempt.  Rather, the statute allows an agency to promulgate rules exempting such systems from the Privacy Act:  "The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of [certain sections] of this title, to exempt any system of records within the agency from [certain subsections] of this section if the system of records is investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2) of this section."  5 U.S.C.

§ 552a(k)(2).  It is not up to this Court, then, to determine if OPR's database should be exempt under subsection (k)(2).  Rather, the question is whether the agency head has promulgated rules exempting it.

It has.  Under 28 C.F.R. § 16.80, the "Office of Professional Responsibility Record Index (JUSTICE/OPR-001)" is a "system of records [] exempt from 5 U.S.C. 552a(c)(3) and (4), (d), (e)(1), (2), and (3), (e)(4)(G) and (H), (e)(5) and (8), (f) and (g)."  28 C.F.R. § 16.80(a)(1).  And as the McCarty Declaration explains, Neese "sought records about herself that are maintained in OPR's Privacy Act system of records (JUSTICE/OPR-001, 76 Fed. Reg. 66752)."  McCarty Decl. ¶ 36.  Those records are thus exempt from the Privacy Act's terms.  *See id.* (citing 28 C.F.R. § 16.80).[2]

Accordingly, because DOJ has "promulgate[d] rules" exempting OPR's database from the Privacy Act under 5 U.S.C. § 552a(k)(2), *see* 28 C.F.R. § 16.80(a)(1), Neese cannot invoke the Privacy Act to recover records in that database.

---

[2] The Court recognizes that, in 1986, the Court of Appeals rejected similar logic in the context of the FBI's Central Record System.  *See Vymetalik v. FBI*, 785 F.2d 1090, 1094–95 (D.C. Cir. 1986). But the regulation exempting that database is nothing like the one at issue here.  As the Court of Appeals explained, the regulation there exempted the Central Record System "only to the extent that information in this system is subject to exemption pursuant to 5 U.S.C. [§] 552[a](j) and (k)." *Id.* at 1095 (quoting 28 C.F.R. § 16.96).  No such limitation exists in OPR's regulation.  Further, *Vymetalik* relied on the specific legislative history underlying the FBI's systems.  *See id.*  That, of course, holds no weight here.  And the Court of Appeals has since confirmed the FBI-specific nature of this holding.  *See Doe v. FBI*, 936 F.2d 1346, 1353 (D.C. Cir. 1991) ("Although both subsections (j) and (k) refer to 'systems of records,' we have previously held that 28 C.F.R. § 16.96, the FBI exemption regulation respecting its CRS, does not remove that entire filing system from the requirements of the Act.").  Outside of this context, courts tend to focus on the core of the statutory language.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1119 (D.C. Cir. 2007) ("Heads of agencies may . . . promulgate rules exempting particular systems of records from § 552a(d)(1) under conditions described at § 552a(j)–(k)."); *Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 25 (D.D.C. 2009) ("[R]egulations have, in fact, been promulgated to exempt these electronic systems from the disclosure provisions of the Privacy Act.  Accordingly, the Court shall grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross-Motion for Summary Judgment with respect to Privacy Act Exemptions (j)(2) and (k)(2).").

### IV. OPR Properly Redacted and Withheld Documents under FOIA

Because OPR's system of records is exempt from the Privacy Act, the Court must assess the reasonableness of OPR's redactions and withholdings under FOIA.  Neese challenges each claimed FOIA exemption.  *See* Pl.'s Resp. at 32–45.  But her challenges mostly fall short.

### A.  FOIA Exemption 3

Under FOIA Exemption 3, 5 U.S.C. § 552(b)(3), an agency need not disclose information that is exempted from disclosure by statute.  OPR invokes this exemption to protect grand-jury material, which is protected from disclosure by Federal Rule of Criminal Procedure 6(e).  *See* McCarty Decl. ¶ 42; *see Murphy v. Executive Office for U.S. Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015) ("[A]lthough a rule is not generally considered to be a statute, [Federal Rule of Criminal Procedure 6(e)] qualifies as one under FOIA because the Congress has enacted it into positive law.").  Specifically, OPR redacted certain information on twenty pages that identify witnesses who appeared before the grand jury.  McCarty Decl. ¶ 42 & n.1.

While Neese is concerned that she "must solely rely upon the statements made by the FBI and OPR with respect to exemption 3," Pl.'s Resp. at 37, she does note that "[t]he grand jury material pertaining to the Pain Train investigation is not the pertinent information Plaintiff Neese sought in her FOIA and Privacy Act requests," *id.* at 38.  While this is not a concession, the Court finds that Exemption 3 was properly invoked to protect grand-jury materials.  The McCarty Declaration details how the material would tend to reveal secret aspects of the investigation, like witness identities.  McCarty Decl. ¶ 41.  That is enough.  *See Murphy*, 789 F.3d at 206 ("[I]nformation related to a grand jury matter may be withheld under exemption 3 'if the disclosed material would tend to reveal some secret aspect of the grand jury's investigation, including the identities of witnesses.'" (quoting *Hodge v. FBI*, 703 F.3d 575, 580 (D.C. Cir. 2013)).

### B.  FOIA Exemption 5

FOIA Exemption 5 covers "inter-agency or intra-agency memorandums or letters that would not be available to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This language "'incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant'—including the presidential communications privilege, the attorney-client privilege, the work product privilege, and the deliberative process privilege—and excludes these privileged documents from FOIA's reach." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *Baker & Hostetler LLP v. U.S Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006)); *see also Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 359 (1979) (commercial-information privilege).  But in order to properly invoke the exemption, it is not enough for the government to show that one of these privileges or doctrines applies.  It must also show that it "reasonably foresees that disclosure would harm an interest protected by" the exemption.  5 U.S.C. § 552(a)(8)(A)(i)(I).  Both OPR and the FBI withheld documents under Exemption 5, citing to attorney-client privilege, attorney-work-product privilege, and deliberative-process privilege.  *See* Mot. at 9.  Neese challenges only those withholdings made under the deliberative-process privilege.  *See* Pl.'s Resp. at 38–40.

The deliberative-process privilege protects documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)).  To invoke this privilege, an agency must show that the document is predecisional and deliberative.  *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991).  A predecisional document is one that comes before an agency policy is adopted.  *See Jordan v. Dep't of Justice*, 591 F.2d 753,

774 (D.C. Cir. 1978) (en banc).  But the agency need not identify *which* final decision the document is predecisional to; the agency need only identify "what deliberative process is involved, and the role played by the documents at issue in the course of that process."  *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000).

Neese raises a threshold objection to OPR's invocation of the deliberative-process privilege:  "This was an OPR inquiry and investigation.  This matter did not involve Executive Branch policy making or deliberations and that exemption affords no protection here."  Pl.'s Resp. at 38.  But she cites no case for this narrow view of the deliberative-process privilege, and the Court cannot find any on its own.  Rather, an agency need only demonstrate that the information is predecisional and deliberative to some policy *or decision*.  *See, e.g.*, *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) ("[D]eliberative process covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." (quotations omitted)); *see also Access Reports*, 926 F.2d at 1194.  And, in any event, OPR is a division of the Department of Justice—an Executive Branch agency.  *See Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 70 (D.C. Cir. 2018) ("Exemption 5 was properly applied to protect OPR's deliberative, pre-decisional process and its discussion of matters related purely to the pending FOIA litigation.").

Turning to the specific withholdings that Neese challenges, Pl.'s Resp. at 39, the Court concludes that OPR properly invoked the deliberative-process privilege.  In Bates Number 300, for example, the Vaughn Index explains that the redactions were made to "[i]nternal OPR e-mails among OPR attorneys . . . concerning the handling of the Neese investigation."  Vaughn Index, ECF No. 32-5 at 10.  The information redacted under exemption 5 on that page "contains internal, pre-decisional information revealing attorney opinions and thought processes on the handling of

OPR's investigation, the disclosure of which would disclose internal pre-decisional discussions and chill full and frank exchange among OPR attorneys." *Id.*  That is a valid application of the privilege. *See Bartko*, 898 F.3d at 70.  And it applies with equal force to OPR's other invocations of the privilege. *See, e.g.*, *id.* at 15 (Bates Number 361; "internal OPR e-mail . . . discussing analysis of request from David Barger"); 17 (Bates Number 386–387; email from OPR attorney "forwarding a May 14, 2018 internal OPR e-mail exchange . . . identifying particular text messages and discussing their significance to the investigation"); 20 (Bates Number 400; emails amongst OPR attorneys discussing "notes of Clark interview"); 21 (Bates Number 405; "internal OPR e-mail . . . pertaining to an interview outline"); 22 (Bates Number 410; email "suggesting investigative steps in the Neese investigation").[3]  Having reviewed each of the redactions made under Exemption 5, the Court concludes, from its inspection of the Vaughn Index and the relevant declarations, that OPR's explanations were full and specific enough to give Neese a meaningful opportunity to contest each one, and to give this Court enough foundation to conclude that each withholding was sound. *King v. Dep't of Justice*, 830 F.2d 210, 217–18 (D.C. Cir. 1987).

### C.  FOIA Exemption 6 and 7(C)

Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  And exemption 7(C) covers "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could

---

[3] Neese also challenges the invocation of exemption 5 for Bates Numbers 383–384, 621, and 687. *See* Pl.'s Resp. at 39.  But OPR did not rely on exemption 5 for these pages. *See* Vaughn Index at 16, 32, 45.  And while Neese challenges the invocation of Exemption 5 for Bates pages 909, 948, 953–75, 983–1005, 1015–18, and 1046, *see* Pl.'s Resp. at 39, those pages were withheld in full pursuant to exemptions 5, 6, and 7(C), *see* Vaughn Index at 70.  The Court concludes that withholding the documents was proper under exemption 5, but even if it were not, Neese's objection to these documents would still fall short on these alternative grounds. *See infra.*

reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). If Exemption 7 applies, this Court need not "consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Roth v. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011). But both exemptions require some form of balancing to determine the privacy interest at stake.

Before invoking exemption 7(C), however, an agency must first show that the information was "compiled for law enforcement purposes." *Id.* § 552(b)(7). The Court of Appeals has taken a broad view of this language, instructing that the key inquiry is "whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. Dep't of Justice*, 284 F.3d 172, 177 (D.C. Cir. 2002) (quotation omitted). Courts must also focus "on how and under what circumstances the requested files were compiled." *Id.* at 176–77. And courts must ensure than an agency "establish[es] a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a . . . violation of federal law." *Bartko*, 898 F.3d at 64 (quoting *Center for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003)) (internal quotation marks omitted). Since OPR does not specialize in law enforcement, it "bears the burden of showing on a case-by-case basis that any requested records were actually compiled for law-enforcement, rather than employment-supervision, purposes." *Id.* at 65.

There is a long history of FOIA requesters attempting to get documents regarding OPR investigations, and of OPR attempting to invoke exemption 7(C) to withhold such records. In *Kimberlin v. Department of Justice*, for example, a requester sought "all papers, documents and things pertaining to the OPR investigation" of an Assistant U.S. Attorney. 139 F.3d 944, 947 (D.C.

Cir. 1998).  The Court of Appeals stated that "[m]aterial compiled in the course of . . . internal agency monitoring does not come within Exemption 7(C) even though it might reveal evidence that later could give rise to a law enforcement investigation."  *Id.* (quotations omitted). "Concluding, however, that 'the OPR investigation here at issue was conducted in response to and focused upon a specific, potentially illegal release of information by a particular, identified official,' the court concluded that the information in the OPR files was compiled for law enforcement purposes." *Jefferson*, 284 F.3d at 177 (quoting *Kimberlin*, 139 F.3d at 947).

The Court is cognizant that the Court of Appeals has "decline[d] to hold as a matter of law that all OPR records are necessarily law enforcement records." *Jefferson*, 284 F.3d at 178.  And normally, OPR's invocation of exemption 7(C) would likely fall short.  As the *Bartko* court explained, while violations of the "U.S. Attorney's Manual, the North Carolina Code of Professional Conduct, and other ethical and legal obligations . . . could conceivably result in civil or criminal sanction, many of them would not, and would bear only on internal disciplinary matters." *Bartko*, 898 F.3d at 65.  Here, OPR failed to detail whether the alleged ethical violations could result in civil sanctions.  *See generally* McCarty Decl.

But a crucial detail shows that OPR's investigation could not have been focused on the "customary surveillance of the performance of duties by [a] government employee[ ]." *Jefferson*, 284 F.3d at 177.  Instead, it necessarily must have been "compiled for law-enforcement, rather than employment-supervision, purposes," *Bartko*, 898 F.3d at 65, because Neese was no longer a government employee during the overwhelming majority of the investigation.  After all, she "resigned her position as an AUSA shortly after OPR initiated its inquiry and therefore was no longer a Department of Justice employee," during its pendency, McCarty Decl. ¶ 54.  The

sanctions to be imposed, if any, could only be external. *Id.* ("[The allegations], if proved, could result in civil sanctions, such as referral to state bar licensing authorities.").

Since OPR has shown that exemption 7(C)'s threshold requirement is met, the Court next turns to balancing.

The first category of information that OPR redacted was the "[n]ames and other identifying information of FBI Agents and OPR, EOUSA, and USAO [s]taff." McCarty Decl. at 12. This information includes cellphone numbers, email addresses, names, and the like. *Id.* ¶ 56. As McCarty explains, "disclosure of this information in connection with an OPR misconduct investigation or the USAO's Operation Pain Train criminal investigation could expose these employees to unwanted attention, notoriety, or harassment." *Id.* ¶ 57. The declaration further details how disclosing the names of FBI agents, in particular, could severely impact their abilities to conduct their jobs. *See id.* While the public might have an interest in how OPR works, that interest does not extend to the contact information of various low-level employees. *Id.* ¶ 58. The Court agrees with this analysis. *See Brown v. FBI*, 873 F. Supp. 2d 388, 403–04 (D.D.C. 2012) (allowing redactions of FBI agent names and phone numbers under exemption 7(C)).

The next category of information that OPR redacted was the "names and other identifying information of third parties incidentally mentioned." McCarty Decl. at 13 (capitalization removed). This information includes the names, phone numbers, and other identifying information for a legal assistant at a private law firm and other private citizens, "such as court reporters and family members of individuals involved in OPR's investigation, who are incidentally identified in responsive records." *Id.* ¶ 59. OPR explained the commonsensical reasons why these individuals have a privacy interest in keeping this information private. *Id.* ¶ 60. And it explained how there is no public interest in that same information. *Id.* ¶ 61. The Court again agrees with its analysis.

*See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991) ("We now hold categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure.").

OPR also redacted "identifying information about the complainant and third parties personally associated with the complainant." McCarty Decl. at 14 (capitalization removed). As OPR explained, it keeps information about complaining witnesses confidential in order to "encourage individuals to provide the most accurate and frank information without fear of being identified and becoming a target for retaliation." *Id.* ¶ 63. OPR claims that this interest outweighs the public's interest in this small category of information. *Id.* ¶ 64. The Court again agrees. *See Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) ("[O]ur decisions have consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants.").

Next, OPR redacted "names and identifying information of witnesses and third parties connected with Operation Pain Train." McCarty Decl. at 15 (capitalization modified). As OPR explained, "[i]dentifying a private citizen in connection with a criminal or misconduct investigation is likely to engender speculation, could stigmatize the individual, and could subject them to harassment or criticism." *Id.* ¶ 66. That outweighs the public's interest, if any, in that information. *Id.* ¶ 67. *See SafeCard Servs.*, 926 F.2d at 1206; *Schrecker*, 349 F.3d at 661.

Finally, OPR redacted the "names and identifying information of subjects of other OPR investigations." McCarty Decl. at 15 (capitalization modified). For many of the same reasons

discussed above, the privacy interest of these individuals outweighs the public's interest, as OPR has detailed in its declaration. *See id.* at ¶ 68; *see also Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 854 F.3d 675, 681–82 (D.C. Cir. 2017) (excluding under Exemption 7(C) those "named or otherwise identified who have not previously been publicly implicated in the corruption investigation").[4]

### D.  FOIA exemption 7(E)

Exemption 7(E) covers "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  "Exemption 7(E) sets a relatively low bar for the agency to justify withholding"; the agency need only "demonstrate logically how the release of the requested information might create a risk of circumvention of the law."  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (quotations omitted).

The FBI used exemption 7(E) to withhold two categories of information:  nonpublic internal email addresses; and methods used by the FBI to collect and analyze information it obtains

---

[4] It is worth noting that, despite having McCarty's Declaration and its justifications for the redactions, Neese does not directly challenge any of the balancing arguments. *See* Pl.'s Resp. at 41–43.  Instead, she broadly contends that this is a matter of public interest, and notes that with respect to certain documents, she received much of the same information that OPR has redacted in other documents. *Id.* at 41.  But as the Second McCarty Declaration explains, these records were Neese's own:  text messages she had sent and received, plus others that she authored or received. Second McCarty Decl. at ¶ 19.  "Even though OPR could have justifiably asserted FOIA exemption 6 or 7(C) to protect the privacy of the individuals names," McCarty explained, "agencies are permitted under the FOIA to exercise their discretion to make voluntary disclosure of information." *Id.*  In doing so, the agency did not lose its ability to redact documents that did not originate with Neese.

for investigative purposes.  *See* Mot. at 20–21.  Neese does not challenge this first category of redactions.  *See* Pl.'s Resp. at 43.  But she does challenge the second.  *See id.*

Neese's objection is well placed.  While the government's burden is low, it has failed to demonstrate how release of the requested information might create a risk that the law is circumvented.  The government merely regurgitates the statutory test, explaining how the release of this information would disclose the identity of the methods it used to collect and analyze information, including where it collects information and the methodologies it uses to analyze it once collected.  Decl. of Michael G. Seidel ("Seidel Decl."), ECF No. 32-6, at ¶ 36.  Thus, it explains, disclosure would enable subjects of FBI investigations to circumvent similar currently used techniques.  *Id.*

But a "near-verbatim recitation of the statutory standard is inadequate."  *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*,, 746 F.3d 1082, 1102 (D.C. Cir. 2014) ("*CREW*").  The Court has not been told what procedures are at stake.  *Id.*  And the Court has not been told how disclosure of these documents would reveal such procedures.  *Id.*  "Although Exemption 7(E) sets a low bar for the agency to justify withholding, the agency must at least provide *some* explanation of what procedures are involved and how they will be disclosed."  *Id.* (quotations omitted).  Thus, because "[t]he [Seidel] Declaration lacks any case-specific, meaningful explanation as to how any particular technique, procedure or guideline at issue *in this case* would make it easier for individuals to evade the law," *Jett v. FBI*, 139 F. Supp. 3d 352, 363 (D.D.C. 2015), the Court will deny its Motion on this point.

Since this case is still ongoing, however, the Court will not close the door to future affidavits making this showing.

### V. THE FBI AND OPR PROPERLY CONCLUDED THAT THERE ARE NO REASONABLY SEGREGABLE PORTIONS OF CERTAIN RESPONSIVE RECORDS

Under FOIA, an agency must disclose "[a]ny reasonable segregable portion of a record" that is nonexempt.  5 U.S.C. § 552(b).  But those nonexempt portions do not have to be disclosed if they are "inextricably intertwined with exempt portions."  *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  "The quantum of evidence required to overcome that presumption" must be shown by the requesting party.  *Id.*

Neese has not come forth with an adequate quantum of evidence.  She has not "produce[d] evidence that would warrant a belief by a reasonable person" that segregation would be possible.  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004).  Rather, she broadly calls the government's assertions "conclusory," and points out that the information on some discs "is likely information downloaded from Emily Clark's computer and cellular telephone(s)."  Pl.'s Resp. at 44.  But the FBI determined that any nonexempt information was so intertwined with the exempt information that it could not be reasonably segregated.  *See id.*  Indeed, it would take many resources to produce disjointed words and phrases, which on their own would have no informational content.  *Id.*  The FBI properly concluded it need not do this.  *See Brown v. Dep't of Justice*, 734 F. Supp. 2d 99, 110–11 (D.D.C. 2010) ("[D]efendant need not expend substantial time and resources to yield a product with little, if any, informational value." (quotations omitted)).

\*       \*       \*

Neese has raised many objections to OPR's redactions and withholdings. But most fall short. The Court will thus grant in part Defendant's Motion for Partial Summary Judgment, ECF No. 32.

DATE:  March 28, 2022

CARL J. NICHOLS
United States District Judge